[Cite as *State v. Akers*, 2019-Ohio-5171.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  8-19-31

    v.

STEVEN A. AKERS, JR.,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 18 12 0365

Judgment Affirmed

Date of Decision:  December 16, 2019

APPEARANCES:

    *Sean P. Martin* for Appellant

    *Sarah J. Warren*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Steven A. Akers ("Akers"), brings this appeal from the May 21, 2019, judgment of the Logan County Common Pleas Court sentencing him to an aggregate fifty-four month prison term after he was convicted by a jury of two counts of Failure to Comply with an Order or Signal of a Police Officer in violation of R.C. 2921.331(B)/(C)(5)(a)(ii), both felonies of the third degree. On appeal, Akers argues that the trial court erred by failing to grant a mistrial once the jury heard about Akers being incarcerated, that the trial court failed to properly investigate an instance wherein a juror potentially saw Akers in handcuffs, and that Akers' convictions were allied offenses of similar import and should have merged for the purposes of sentencing.

*Background*

{¶2} At approximately 8:24 p.m. on November 9, 2018, Jerrod Hostetler of the Bellefontaine City Police Department was on patrol in a marked cruiser when he observed a yellow Chevy truck without a working front license plate light. Officer Hostetler pulled out behind the vehicle and ran the registration, which came back to a "female who was suspended out of Franklin County." (April 18, 2019, Tr. Vol I. at 124). That female was Leah Akers, the wife of Akers. Although they were still married, Leah and Akers were separated at that time. Leah was living in Canal Winchester.

{¶3} While following the yellow truck, Officer Hostetler observed the driver run through a red light when making a left turn. Officer Hostetler then activated his emergency lights to initiate a traffic stop. At this time he did not activate the siren, just the lights.

{¶4} The driver of the vehicle turned onto a Walmart access road and then into a gas station. Officer Hostetler thought that the driver appeared to be a male and that the driver was alone, but the officer was not certain.

{¶5} The driver pulled through the gas station, then continued slowly through the Walmart parking lot. As the driver continued through the parking lot without stopping despite the officer's emergency lights being activated, Officer Hostetler radioed for assistance because he did not know what the driver's "intentions [were] at that time." (April 18, 2019, Tr. Vol. I at 128). Before leaving the Walmart lot, Officer Hostetler activated his siren in addition to his overhead lights.

{¶6} When leaving the Walmart parking lot, the driver of the yellow truck ran a stop sign. The driver then turned onto Guntown Road and accelerated to over 53 or 54 mph in a 45 mph zone.

{¶7} The driver went through another stop sign and was moving out of the city limits onto County Road 29. Officer Hostetler radioed the officer in charge for permission to leave the city and follow the truck, but permission was denied. Officer Hostetler indicated that generally when they had pursuits that were not related to

felony crimes, the pursuits were usually terminated. Officer Hostetler stated that they had the license plate of the truck and intended to work backwards in the investigation due to the traffic violations being minor. Officer Hostetler then terminated his pursuit, and the situation was relayed to the Logan County Sheriff's Department.

{¶8} Deputy Miriam Reames of the Logan County Sheriff's Department was operating a patrol car with Deputy Adam Wood in the passenger seat and they observed the flashing lights from Officer Hostetler's cruiser when he was following the yellow truck. They were approaching from another direction and Deputy Reames drove toward the flashing lights to investigate what was happening.

{¶9} As Deputy Reames neared an intersection she observed the Bellefontaine city police cruiser turn its overhead lights off. Around that time, Deputy Reames and Deputy Wood were notified that a Bellefontaine city police officer had been following a yellow truck that was failing to comply and that the officer following the truck had terminated his pursuit. The deputies were advised to stop the yellow truck if they located it.

{¶10} Deputy Reames turned onto County Road 29 where the yellow truck had gone, passing the Bellefontaine city police cruiser. After driving for a mile or more the yellow truck was located. The deputies opted to follow the truck to see if they could acquire probable cause to make their own traffic stop. They observed

several lane violations by the driver of the yellow truck, then they attempted to initiate a traffic stop. The lights and the siren on the cruiser were activated, but the yellow truck did not stop. In fact, the yellow truck passed multiple vehicles in a no passing zone, and then went south toward West Liberty.

{¶11} The yellow truck also ran another stop sign at the intersection of Highway 5 and Highway 1. Around that time Deputy Wood radioed ahead to West Liberty for an officer to deploy spike strips, but the officer from West Liberty was unable to do so in time. Eventually the yellow truck approached US68 just outside of West Liberty and ran a stop sign there as well. As the truck turned onto US68, there was an oncoming vehicle that the yellow truck failed to yield to and the vehicle had to go off the right side of the road to avoid a collision. Afterward, the yellow truck went northbound on US68, returning towards Bellefontaine.

{¶12} On the way toward Bellefontaine, the yellow truck began picking up speed, exceeding 100 mph. When the truck passed a semi, it ran an officer off the road who was traveling southbound on US68.

{¶13} The Bellefontaine City Police Department was made aware that the yellow truck was returning to Bellefontaine, so they attempted to deploy spike strips. However, they did not get the strips set up in time before the yellow truck drove past them into town at roughly 8:40 p.m.

{¶14} Once back in Bellefontaine, the driver of the yellow truck turned onto Guntown Road at a high rate of speed. It eventually turned left on Ludlow. At that time, the commanding officer for the deputy sheriffs advised them to terminate their pursuit. The pursuit of the yellow truck undertaken by the Logan County Sheriff's Department had covered 13 or 14 miles.

{¶15} Sometime prior to 8:50 p.m., Sara Perdue was outside with her dog at the Red Bud Court apartment complex in Bellefontaine when she saw a yellow truck approaching. Perdue observed a man jump out of the truck while it was still moving. She saw the man wipe his hands on the grass, then the man took off running. Perdue did not get a good look at the man because it was dark. Perdue asked if the man was 'okay,' but he did not answer. Perdue went inside and called 9-1-1 because she did not know whether someone was hurt. She was also nervous because of the whole situation and did not know if someone else was in the vehicle.

{¶16} Numerous officers from different agencies responded to the Red Bud Court apartments. The yellow truck was present, still running, with its door open. Inside the truck, on the driver's side floor, was a cell phone in a case. The case also had a compartment for cards, and this compartment contained an identification card for Akers, as well as several other cards belonging to Akers.

{¶17} Although law enforcement did not know at the time, Akers' uncle lived at Red Bud Court apartments. Akers' uncle had not seen Akers for a few

months. However, around 9:30 p.m. that evening, Akers' uncle walked into his kitchen and he saw Akers sitting at his table.

{¶18} Akers was not located by law enforcement that night. Law enforcement did speak with Leah Akers in Canal Winchester, who advised them that Akers had the yellow truck during their separation.

{¶19} The next morning, Akers called his sister and told her that he could not locate his phone or his truck. His sister suggested that Akers go to the police station if he thought his truck was missing, and Akers ultimately did that, getting a ride from his sister. At the police station, Akers spoke with police and stated that he had dropped his truck off with a friend who worked as a mechanic in Bellefontaine the night before to have a window fixed. Akers stated he did not know what happened to the truck after that. Akers also gave a vague timeline of his whereabouts the evening prior.

{¶20} Officers investigated Akers' claims and found them to be untrue, particularly with regard to leaving the truck with his friend/mechanic the night before. Akers was subsequently indicted in this matter on December 11, 2018, for two counts of Failure to Comply with an Order or Signal of a Police Officer in violation of R.C. 2921.331(B)/(C)(5)(a)(ii), both felonies of the third degree. There was one count for Akers' failure to comply with the Bellefontaine City Police

Department and one count for Akers' subsequent failure to comply with the Logan County Sheriff's Department.

{¶21} Akers pled not guilty to the charges and proceeded to a jury trial, which was held April 18-19, 2019. After the testimony and evidence was presented, including dash camera video from the Bellefontaine city police cruiser and the audio from the interrogation of Akers, the jury found Akers guilty of both counts against him.

{¶22} On May 17, 2019, the matter proceeded to sentencing. Akers' attorney argued that the two counts should merge for sentencing, but the trial court disagreed, finding that they were separate actions. The trial court then recited Akers' extremely lengthy criminal history. Afterward the trial court sentenced Akers to serve eighteen months in prison on the first Failure to Comply conviction, and thirty-six months in prison on the second Failure to Comply conviction. The trial court reasoned that the second act was far more egregious than the first. The trial court ordered the prison terms to be served consecutively for an aggregate fifty-four month prison term.[1] A judgment entry memorializing Akers' sentence was filed May 21, 2019. It is from this judgment that Akers appeals, asserting the following assignments of error for our review.

---

[1] At the sentencing hearing, Akers seemed to admit his culpability in this matter and take responsibility for his actions.

**Assignment of Error No. 1**
**The Trial Court failed [to] grant a mistrial once the jury learned of the Defendant's incarceration status from the State of Ohio's witness.**

**Assignment of Error No. 2**
**The Trial Court failed to properly investigate and document the encounter of the Defendant in handcuffs by one of the jurors.**

**Assignment of Error No. 3**
**The convictions for Count One and Count Two, both for Failure to Comply with Order or Signal of Police Officer are allied offenses of similar import and cover one course of conduct, which should lead to both convictions being merged at sentencing.**

*First Assignment of Error*

{¶23} In his first assignment of error, Akers argues that the trial court erred by failing to grant a mistrial once the jury learned of his incarceration from a State's witness. He also argues that the trial court's curative instruction was insufficient to remedy the prejudice sustained by Akers as a result of the jury learning of his incarceration, and that his attorney was ineffective for failing to object to the curative instruction.

Standard of Review

{¶24} The decision as to whether to grant a mistrial is within the sound discretion of the trial court. *State v. Carter*, 3d Dist. Allen No. 1-15-62, 2017-Ohio-1233, ¶ 93, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92. An abuse of discretion constitutes a decision that is arbitrary, capricious, or grossly unsound. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶25} As to Akers' argument that his counsel was ineffective, "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez,* 3d Dist. Defiance Nos. 4–16–27, 28, 2017–Ohio–2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Analysis

{¶26} In this case, the State called a witness named Billie Henderson to testify at trial. During Henderson's testimony, the following exchange took place.

> **Q [Prosecutor]. You mentioned getting a letter at the jail. Do you have a criminal history?**
>
> **A.    Um, just F-5, obstructing justice.**
>
> **Q.    Were you incarcerated in the Logan County Jail because of that?**
>
> **A.    Yes ma'am.**

**Q. You said you got a letter at the jail from the defendant?**

**A. In-house mail. They do it on Sundays.**

**Q. So, one inmate can send a letter to another inmate?**

**A. Yes, ma'am.**

**Q. And you received a letter from [Akers]?**

**A. Yes, ma'am.**

(April 18, 2019, Tr. Vol. II at 22-23).

{¶27} At this point in the testimony, the defense objected and requested a sidebar. Defense counsel then argued, outside of the hearing of the jury, that the testimony regarding the letter was not only irrelevant to the trial but also that it was highly prejudicial given that the witness had just indicated Akers had been incarcerated. Defense counsel requested that the matter be cured by a mistrial.

{¶28} The trial court denied defense counsel's request for a mistrial, indicating that the issue could be cured. Defense counsel stated that short of a mistrial he wanted a curative instruction that Akers was incarcerated because of this set of events.

{¶29} When the trial resumed the trial court made the following statement to the jury.

> **THE COURT: Ladies and gentlemen, there was an objection posed and the objection was to the discussion that the defendant was in jail for a period of time at the same time this witness was. That's somewhat prejudicial because your minds can wander in**

-11-

**many directions as to why he was there. Brief answer is he was placed under arrest as a result of this particular set of events and incarcerated. You must not consider the fact that he was in jail and incarcerated as evidence of his guilt. * * * [D]oes that satisfy?**

**[DEFENSE COUNSEL]: Yes, Your Honor.**

**THE COURT: Very good. Again, you must not consider that in your deliberations. You may continue.**

(*Id*. at 26-27).

{¶30} On appeal, Akers argues that the trial court should have granted his motion for a mistrial, that the curative instruction was insufficient to remedy the prejudice, and that his attorney was ineffective for failing to object to the curative instruction.

{¶31} Contrary to Akers' arguments, the Supreme Court of Ohio has held that where a reference to a prior arrest was fleeting and promptly followed by a curative instruction, the reference did not unfairly prejudice the defendant so as to require a mistrial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 175; *see also State v. Junod*, 3d Dist. Mercer No. 10-18-08, 2019-Ohio-743, ¶ 45. Here, there was only a passing reference to Akers' incarceration and the jury was given an immediate and explicit curative instruction. The curative instruction plainly emphasized that the jury "must not" consider the incarceration as evidence of guilt.

{¶32} Moreover, the jury was instructed multiple times by the trial court that Akers was presumed innocent until proven guilty beyond a reasonable doubt, *and*

that the jury could not consider any evidence that had been stricken by the trial court. A jury is presumed to follow a trial court's instructions, including curative instructions. *Junod* at ¶ 45 citing *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168. Given the immediate curative instruction, and the presumption that the jury followed a trial court's instructions, we cannot find that the trial court abused its discretion in denying Akers' motion for a mistrial based on this single isolated mention of Akers' incarceration.

{¶33} Moreover, we cannot find that Akers' attorney was ineffective for failing to object to the curative instruction. While Akers claims that his attorney should have requested that the trial court simply tell the jury to disregard the witness's testimony about Akers' incarceration without mentioning why Akers was incarcerated, the passing mention simply does not rise to prejudicial error in this matter. Thus Akers would be unable to satisfy one of the two elements of ineffective counsel, and we need not analyze his ineffective counsel claim further. *See State v. Bradley*, 42 Ohio St.3d 136, 143 (1989). For all of these reasons, Akers' first assignment of error is overruled.

*Second Assignment of Error*

{¶34} In his second assignment of error, Akers argues that the trial court failed to properly investigate a potential encounter between Akers and a juror while Akers was in handcuffs. Akers also contends that his attorney was ineffective for

failing to request that the trial court speak with the juror to discuss what the juror may or may not have seen.[2]

**{¶35}** Akers' argument refers to an incident that occurred on the morning of the second day of trial. Regarding that incident, the trial court stated as follows.

> **THE COURT: * * * It was reported to me this morning that one of the jurors was coming into the building while the defendant and another individual, Kandale Harrison is his name, were being transported to the Courthouse. Mr. Harrison is in an orange jumpsuit in the same vehicle with the defendant who is being transported from the jail in civilian clothes. Both of them were wearing handcuffs.**
>
> **The concern was whether the jurors saw the defendant in handcuffs which arguably would require some sort of explanation but I understand – I haven't learned of this – the Bailiff inquired of the juror that arguably saw and what we learned is that the defendant and Mr. Harrison saw the juror but the juror did not see them. That's basically, the way it was?**
>
> **DEPUTY: Yes, sir.**
>
> **THE COURT: So, you know, you can see the jurors while you're in handcuffs but they should not be seeing you. So, she saw a person in an orange suit getting out of the car and the other person she did not see your handcuffs so that's the explanation.**
>
> **I don't believe that it requires any further explanation. I do not wish to, personally, inquire of the jurors because I think that just taints the issue. That's, in effect, saying, did you see this? And it's like ringing the bell for them. So, are you satisfied for [sic] that explanation?**
>
> **[DEFENSE COUNSEL]: I believe so, Your Honor.**

---

[2] The argument related to ineffective assistance of counsel is analyzed under the same standard of review cited previously.

(April 19, 2019, Tr. at 3-4).

{¶36} On appeal, Akers contends that the trial court should have directly spoken with the juror to determine if anything was seen, rather than relying on the bailiff's statement. In addition, he argues that his counsel was ineffective for failing to investigate this matter further.

{¶37} At the outset, we emphasize that there is no indication that any juror actually saw Akers in handcuffs. For this reason alone Akers' claim to *any* prejudicial error in this matter is entirely speculative.

{¶38} Nevertheless, even if there was an inadvertent sighting, the accused must present evidence that the jury was tainted by the sighting. The Supreme Court of Ohio has held that, "[t]he danger of prejudice to defendants is slight where a juror's view of defendants in custody is brief, inadvertent and outside the courtroom." *State v. Kidder*, 32 Ohio St.3d 279, 285-286; *see also State v. Creech*, 7th Dist. Jefferson No. 13JE41, 2014-Ohio-4004, ¶ 43; *State v. Peyatt*, 7th Dist. Monroe No. 18MO0006, 2019-Ohio-3585, ¶¶ 38-40.

{¶39} Moreover, in *State v. Creech*, 7th Dist. Jefferson No. 13JE41, 2014-Ohio-4004, the Seventh District Court of Appeals determined that since it is a normal and necessary practice to handcuff defendants during transportation to prevent escape, the regular instructions on presumption of innocence are sufficient curative instructions even if the jury did view the defendant handcuffed directly

following transportation. *See also Peyatt*, *supra*. Similar to *Creech*, instructions regarding the presumption of innocence were given in this matter.

{¶40} Finally, we cannot find that Akers has demonstrated ineffective assistance of counsel in this matter when the only indication in the record is that the juror did not actually see Akers in handcuffs. We cannot speculate that the juror did actually see something, that it would have been uncovered had the attorney inquired, *and* that the sighting tainted the jury. Akers has demonstrated no reversible prejudicial error. Therefore, his second assignment of error is overruled.

### *Third Assignment of Error*

{¶41} In his third assignment of error, Akers argues that this convictions for Failure to Comply should have merged for the purposes of sentencing. Specifically, he contends that the crimes were both part of the same course of conduct.

### Standard of Review

{¶42} " 'Whether offenses are allied offenses of similar import is a question of law that this Court reviews de novo.' " *State v. Jessen*, 3d Dist. Auglaize No. 2-18-16, 2019-Ohio-907, ¶ 22, quoting *State v. Frye*, 3d Dist. Allen No. 1-17-30, 2018-Ohio-894; *State v. Ruff*, 143 Ohio St.3d 114, 2013-Ohio-1441."

### Analysis

{¶43} Revised Code 2941.25, Ohio's multiple-count statute, states:

**(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the**

**indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

**(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

The Supreme Court of Ohio has held that,

**[a]s a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.**

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 31.

**{¶44}** In this case, Akers argues that the pursuits by the Bellefontaine City Police Department and the Logan County Sheriff's Department were not separated by "any appreciable amount of time." (Appt.'s Br. at 14). Akers further contends that the crimes were committed in the same general area, and thus should have merged.

**{¶45}** The trial court directly addressed merger at the sentencing hearing and found that there were "pretty clearly two separate events." (May 17, 2019, Tr. at 21). The trial court indicated that it had heard the testimony at trial and was aware

that there were "completely separate and independent chase[s]." (*Id.* at 26). After reviewing the record, we agree with the trial court.

{¶46} Officer Hostetler originally tried to stop Akers' vehicle near Walmart but Akers would not comply. Akers then drove off, running stop signs, heading out of the city limits. At that time Officer Hostetler terminated his pursuit of Akers, indicating that he would work the case in reverse from the truck's license plate. When Officer Hostetler terminated his pursuit, he was unaware that deputies from the Logan County Sheriff's Department were so close that they would soon be following Akers. Akers' first instance of Failure to Comply was complete when Akers failed to comply with the signal of Officer Hostetler.

{¶47} Then, the second instance of Failure to Comply occurred when the deputies from the Logan County Sheriff's Department attempted to stop Akers *after they had been following him and observed their own probable cause for a stop*. This created a completely separate act, removed in time and location from the original crime. Thus the convictions would not merge.

{¶48} Notwithstanding the prior point, although both "victims" in this matter were law enforcement, they were not the same law enforcement officers or even officers from the same agency. Therefore they were not the same "victims" under *Ruff*, which indicates that the harm is separate and identifiable. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, at paragraph 2 of the syllabus. For all of these

reasons we cannot find that the trial court erred in finding that the convictions do not merge for purposes of sentencing. Accordingly, Akers' third assignment of error is overruled.

## Conclusion

**{¶49}** For the foregoing reasons the assignments of error are overruled and the judgment of the Logan County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/jlr**