[Cite as *State v. Passmore*, 2023-Ohio-3209.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

                         CASE NO. 5-22-39

    v.

DOMINIC I. PASSMORE,                 O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2022-CR-00011**

**Judgment Affirmed**

**Date of Decision:  September 11, 2023**

---

**APPEARANCES:**

    *Anthony J. Richardson* **for Appellant**

    *Phillip A. Riegle* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Dominic I. Passmore ("Passmore") appeals the judgment of the Hancock County Court of Common Pleas, alleging his conviction is not supported by sufficient evidence; that his conviction is against the manifest weight of the evidence; that the trial court improperly imposed financial sanctions; that he was denied his right to a fair trial; that he did not receive the effective assistance of counsel; and that the trial court erred by imposing consecutive sentences. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On the evening of December 18, 2021, Latasha Jaquez ("Jaquez") went to the house of her friend, Brittney Tate ("Tate"), to celebrate Tate's birthday. Another one of Tate's friends, Sonia Bair ("Bair"), was also present. They decided to go to a local bar to have some drinks. On their way, Bair drove Jaquez and Tate to a nearby Circle K gas station in Findlay, Ohio because they wanted to purchase some cigarettes. Bair pulled into the gas station parking lot at roughly 12:45 A.M. on December 19, 2021.

{¶3} Jaquez, Tate, and Bair exited the vehicle and went into the gas station store. While Jaquez was at the counter selecting her cigarettes, Tate and Bair went over to a nearby automatic teller machine to withdraw some cash. At some point, Passmore got in line behind her. Jaquez testified that Passmore was making some

comments to her but that she ignored him. Tate then told Passmore to stop making comments to Jaquez. Passmore called Tate a "b***h." (Tr. 261). Tate responded by saying, "I don't care. We're from Findlay. We're classy, not Trashy." (Tr. 261). Tate and Passmore continued to exchange words with the intensity of this discussion escalating very quickly.

{¶4} Jaquez turned her head towards Passmore in time to see him "push her [Tate] in the face * * *." (Tr. 262). Jaquez told them to stop. She then turned towards the clerk behind the counter, Stephen LaRue ("LaRue"), for the purpose of asking him to call 9-1-1. At this moment, she felt Passmore grab onto her head with both of his hands before he slammed her head down into the counter. After the top portion of her skull made contact with the counter, Jaquez fell to the ground with her head hitting the floor.

{¶5} Unable to stand, Jaquez crawled behind the counter where she begged LaRue to call 9-1-1. She testified that she was bleeding and "very dizzy." (Tr. 265). She also stated that her "vision was bouncing back and forth." (Tr. 265). Passmore then left the store with two other people who had come with him. They got into a red pickup truck and drove away. By this point, LaRue had called 9-1-1 to request police and emergency medical assistance.

{¶6} Officer Noah Burkholder ("Officer Burkholder") of the Findlay Police Department arrived on the scene before Emergency Medical Services ("EMS"). When he entered the store, he noticed blood and hair on the floor. He also noticed

that the store was in "disarray" with "[t]he displays ha[ving] been knocked over, and * * * items everywhere." (Tr. 351). At that time, Jaquez was sitting on the floor with a "towel * * * covered in blood * * * on her head" and "was very disoriented." (Tr. 351). She appeared to either be "losing consciousness, or maybe just regaining consciousness * * *." (Tr. 351).

{¶7} Sensing that Jaquez might have a concussion, Officer Burkholder "took control of the towel" pressed against her head and "tried to hold her head * * * still * * * to help protect her neck and her spine from any further injury." (Tr. 352). EMS arrived at roughly 1:15 A.M. After dressing her head wound and fitting a C-Collar around her neck, EMS took Jaquez out of the store on a stretcher and transported her to the emergency room at Blanchard Valley Hospital. Jaquez had seven staples put into her head to close her laceration. She also had a concussion.

{¶8} Shortly after the altercation at Circle K, Patrolman Joshua Scharp ("Patrolman Scharp") received a report from dispatch that several individuals potentially involved in the incident were fleeing from the scene in a red pickup truck. Within roughly ten seconds of receiving this dispatch, he saw a vehicle matching this description leaving Circle K and initiated a traffic stop. Three people were inside the pickup truck. Passmore was sitting in the back seat. The other two passengers were Passmore's brother and sister.

{¶9} After Patrolman Scharp approached the vehicle, he asked the occupants to identify themselves. Passmore stated that his name was Dequan Thomoson.

Patrolman Scharp then asked about the incident that occurred in Circle K. He testified that Passmore responded by saying that a "female was talking shit" and that "he didn't like it and a fight broke out." (Tr. 391). Passmore also indicated that this female, later identified as Tate, "pushed him, and he pushed her away from him." (Tr. 395). Shortly thereafter, Passmore was taken into custody.

{¶10} On January 1, 2022, he was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree. A jury trial was held on October 31, 2022 and November 1, 2022. Passmore testified in his own defense. The jury then returned a verdict of guilty on the count of felonious assault. Passmore was then sentenced on November 28, 2022.

{¶11} Passmore filed his notice of appeal on December 15, 2022. On appeal, he raises the following six assignments of error:

**First Assignment of Error**

**Is there sufficient evidence to hold that appellant, Mr. Passmore, committed felonious assault, which is a crime fit for a shooting, where there was no evidence he intended to harm the alleged victim, and no evidence his actions caused incapacitation or the like to be considered serious harm akin to shooting? Appellant urges this reviewing court to assess the record and reverse the matter, there holding that there is insufficient evidence of the necessary *mens rea* and element of serious harm.**

**Second Assignment of Error**

**Did the jury lose its way when finding that appellant, Mr. Passmore, committed felonious assault, which is a crime for a shooting, where there is no evidence his actions caused incapacitation, or the like, to be considered serious harm akin to**

**a shooting? Appellant urges this reviewing court to assess the record and reverse the matter, there holding the jury lost its way in finding appellant acted with the necessary *mens rea* and/or caused serious harm.**

### Third Assignment of Error

**Did R.C. 2929.19(B) require a stated finding by the trial court, or a minimum support in the record, that appellant has or had the means to pay financial sanctions imposed under R.C. 2929.18(A)(4), before the trial court imposed such financial sanctions? Appellant urges this reviewing court to assess the record and reverse the matter, there holding that the trial court must engage in an analysis and make a finding at the sentencing hearing and/or in the sentencing entry, or at minimum have support for such finding, before imposing a financial sanction under R.C. 2929.18, as contemplated in R.C. 2929.19(B)(5).**

### Fourth Assignment of Error

**Should the prosecution be allowed to intentionally ignore and violate the appellant's right to a fair trial, even against admonition of the trial court, when the violation and ignoring of the admonition resulted in the jury hearing an extremely prejudicial and speculative statement that, single handedly, could have resulted in the jury finding appellant intended to seriously harm the alleged victim? Appellant urges this reviewing court to assess the record and reverse the matter, there holding that appellant was deprived of a fair trial when the prosecution violated his right to by intentionally offering a statement, against court order, that on its lonesome would suffice to find the *mens rea* element.**

### Fifth Assignment of Error

**Is it effective assistance of counsel to stipulate to highly prejudicial evidence and in essence waive all rights and arguments related to and under Evid.R. 609, in an effort to mitigate at or streamline trial, where that strategy falls below a reasonable standard of care causing a guilty verdict, when considering appellant requested a jury trial of peers who did not**

**have sufficient instruction or opportunity to fairly judge his actions on the occasion for which he was charged without holding his past violent crime against him or treating the evidence as character evidence? Appellant urges this reviewing court to assess the record and reverse the matter, there holding trial counsel's strategy fell below a reasonable standard of care by employing an obvious, losing strategy, and the outcome would have been different in that appellant would not have been found guilty and sentenced.**

**Sixth Assignment of Error**

**Should consecutive sentences be imposed where the record does not support that all the findings related to R.C. 2929.14, were supported in the record with competent, credible evidence? Appellant urges this reviewing court to assess the record and reverse the matter, there holding that consecutive sentences were inappropriate under the law.**

*First Assignment of Error*

{¶12} Passmore asserts that his conviction for felonious assault is not supported by sufficient evidence, arguing that the State failed to produce evidence that he intended to cause serious physical harm to Jaquez.

Legal Standard

{¶13} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002-Ohio-1276, ¶ 19. This "analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d

Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

**{¶14}** An appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668 (1997). On appeal, the applicable standard

> is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

**{¶15}** To establish a conviction for the offense of felonious assault in violation of R.C. 2903.11(A)(1), the State must prove that the defendant knowingly * * * cause[d] serious physical harm to another * * *." R.C. 2903.11(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain

nature." R.C. 2901.22(B). Further, R.C. 2901.01(A)(5) defines "serious physical harm to persons" as including the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5). "The Ohio Supreme Court has held that one can infer from the defendant's action under the circumstances whether the defendant possessed an intent to cause serious physical harm." *State v. Ross*, 2d Dist. Montgomery No. 20031, 2004-Ohio-3093, ¶ 21, citing *State v. Seiber*, 56 Ohio St.3d 4, 15, 564 N.E.2d 408, 420 (1990).

### Legal Analysis

{¶16} On appeal, Passmore first argues that the State did not produce evidence that Jaquez suffered serious physical harm. However, during his trial testimony, Passmore affirmed that his "actions caused serious physical harm to Latasha [Jaquez.]" (Tr. 456). Further, the State introduced evidence that was consistent with Passmore's admission. Officer Burkholder testified that, when he

arrived at Circle K, Jaquez appeared to be having symptoms of a concussion and that he was holding a towel to her head because she had been bleeding. He stated that Jaquez told him "that she had hit her head, and that she thought she lost consciousness." (Tr. 352). He further testified that Jaquez "was nodding off or losing consciousness or maybe just regaining consciousness, like she was very disoriented." (Tr. 351).

{¶17} Paramedic Kevin Kozel ("Kozel") testified that he was involved in treating Jaquez. Kozel stated that she had an elevated heart rate and blood pressure levels. Another EMS first responder, Diane Pack ("Pack"), testified that she observed a laceration on Jaquez's head that was "significantly deep" and was informed that Jaquez had lost consciousness. (Tr. 307). Pack testified that she helped place a C-Collar around Jaquez's neck to stabilize her and that Jaquez had to be carried out of Circle K on a stretcher.

{¶18} Jaquez testified that, after her head struck the counter, she hit the ground and could not initially move her body. She could not stand up, was dizzy, and was having issues with her vision. At the hospital, seven staples were put into her head to close the laceration. Jaquez testified that she had trouble with dizziness, nausea, and balance for around one month after the incident, causing her to seek follow up treatment from her doctor. She also reported that she had a concussion and that she still experienced numbness in the affected area of her skull at the time

of trial.  The State introduced Jaquez's medical records and pictures of her injuries to corroborate these statements.

{¶19} From this evidence, a rational trier of fact could conclude that Jaquez sustained serious physical harm from having her head slammed into the counter at Circle K.  *See State v. Burks,* 3d Dist. Seneca No. 13-05-36, 2006-Ohio-2142, ¶ 19-20 (concluding evidence that the victim sustained a concussion was sufficient to establish serious physical harm); *State v. Battles*, 8th Dist. Cuyahoga No. 109265, 2021-Ohio-310, ¶ 17; *State v. Long*, 2014-Ohio-4416, 19 N.E.3d 981, ¶ 57 (11th Dist.).  Thus, this first argument is without merit.

{¶20} Second, Passmore asserts the State did not establish that he "acted with the awareness" that his actions would cause Vaquez to be injured.  Appellant's Brief, 12.  However, Jaquez testified that Passmore grabbed both sides of her head with his hands and then slammed her head onto the counter.  She described his actions as "bash[ing]" her "head into the counter." (Tr. 289).  Jaquez stated that she then fell to the ground and was unable to stand back up.

{¶21} Bair similarly testified that Passmore grabbed Jaquez's head and "slammed" her head "straight back" onto the counter.  (Tr. 371).  She then stated that she heard a "thud" when Jaquez's head hit the floor and that her body began shaking.  (Tr. 371).  During his testimony, Passmore admitted that both of his hands were on Jaquez's head and that he "forcibly push[ed]" her "face first" down into the counter.  (Tr. 465).  He also stated, "I pushed her as hard as I possibly could, because

-11-

I was trying to get her away from me. And so my momentum brought us into the counter." (Tr. 447).

{¶22} The undisputed evidence presented at trial indicates that Passmore grabbed Jaquez's head with both of his hands and forcefully slammed her skull into the counter "as hard as * * * [he] possibly could * * *." (Tr. 447). He acted with such force that Jaquez reportedly lost consciousness, fell to the floor, and sustained a concussion. *State v. Beaver*, 3d Dist. Union No. 14-13-15, 2014-Ohio-4995, ("Punching someone in the face satisfies the requisite culpable mental state for felonious assault * * *."); *State v. Vanover*, 4th Dist. Lawrence No. 98CA38, 1999 WL 354337, *5, (May 18, 1999) ("[T]he mere act of punching someone in the head area carries with it the risk of causing serious physical harm."); *State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 55 (holding that "a single punch to the head or face can support a conviction for felonious assault").

{¶23} Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable trier of fact could conclude that Passmore acted with the requisite intent to commit felonious assault. Serious physical harm—in this case, a deep laceration and concussion—was a "natural and logical consequence[]" of Passmore's conduct. *Lloyd* at ¶ 57. *See State v. Higgins*, 9th Dist. Summit No. 26120, 2012-Ohio-5650, ¶ 19 (To act knowingly, "it is only necessary that the serious physical harm is a 'reasonable and probable' result of his action."). Thus,

his second argument herein is without merit. Accordingly, Passmore's first assignment of error is overruled.

*Second Assignment of Error*

**{¶24}** Passmore argues that his conviction for felonious assault is against the manifest weight of the evidence.

Legal Standard

**{¶25}** The manifest weight of the evidence analysis examines whether the State has carried its burden of persuasion at trial. *State v. Wilson*, 2022-Ohio-504, 185 N.E.3d 176, ¶ 58 (3d Dist.). In this process, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 12, quoting *Plott*, *supra*, ¶ 73. Accordingly, an "appellate court sits as a 'thirteenth juror' * * *." *Barga*, *supra*, at ¶ 19, quoting *Thompkins*, *supra*, at 388.

> Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *Thompkins* at 387.

**{¶26}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the

witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶27}** Passmore first argues that the conclusion that Jaquez suffered serious physical harm in this case is against the manifest weight of the evidence. However, at trial, Passmore did not dispute that Jaquez had suffered serious physical harm. Further, Jaquez testified that she had a concussion; received seven staples to close the laceration in her head; and still had symptoms related to this injury at the time of the trial. Kozel, Pack, and Officer Burkholder also testified about the nature and extent of Jaquez's injuries. The State introduced pictures of Jaquez's injuries and copies of her medical records at trial. Given this evidence, we cannot conclude that the evidence in the record weighs more heavily against the finding that Jaquez suffered serious physical harm.

**{¶28}** Passmore next argues that the conclusion that he acted with the intent required for a felonious assault conviction is against the manifest weight of the evidence. At trial, Jaquez testified that Passmore grabbed her head with both of his hands and then slammed her skull against the counter. During his testimony,

-14-

Passmore admitted that he put both of his hands on Jaquez's head and pushed her head down. He testified that he "pushed her as hard as [he] * * * possibly could * * *." (Tr. 447). However, Passmore also testified that he did not intend to slam Jaquez's head into the counter and that he only meant to push her away. The jury heard this testimony and watched the security camera footage of this altercation. Having reviewed the same materials, we cannot conclude that the evidence in the record weighs more heavily against the conclusion that Passmore acted with the intent required to commit felonious assault.

{¶29} Finally, Passmore argues that the conclusion that he did not act in self-defense was against the manifest weight of the evidence. Under Ohio law, if the defendant carries the burden of producing evidence that tends to establish that he or she acted in self-defense, the State then bears the burden of persuasion in establishing that the defendant did not use force in self-defense. *State v. Grant*, 2023-Ohio-2720, --- N.E.3d ---, ¶ 68 (3d Dist.). Thus, the State must "disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

> Self-defense through the use of non-deadly force is present where: '(1) the accused was not at fault in creating the situation giving rise to the affray, (2) the accused (even if mistaken) had a bona fide belief that he was in imminent danger of any bodily harm; and (3) the only means to protect himself from such danger was the use of force not likely to cause death or great bodily harm.'

*State v. Eddy*, 3d Dist. Allen No. 1-22-17, 2022-Ohio-3965, ¶ 65, quoting *State v. Chavez*, 3d Dist. Seneca Nos. 13-19-05, 13-19-06, and 13-19-07, 2020-Ohio-426, ¶ 40. "The elements of self-defense are cumulative, and a defendant's claim of self-defense fails if any one of the elements is not present." *State v. Ridley*, 1st Dist. Hamilton No. C-210458, 2022-Ohio-2561, ¶ 15.

**{¶30}** As to the first element of self-defense, "Ohio courts have long recognized that a person cannot provoke [an] assault or voluntarily enter an encounter and then claim a right of self-defense." *State v. Woodson*, 6th Dist. Lucas No. L-21-1068, 2022-Ohio-2528, ¶ 82, quoting *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 WL 126973, *3 (Jan. 22, 2002). We turn to examining the circumstances leading up the physical altercation in this case.

**{¶31}** Jaquez testified that, while she was in line to buy cigarettes at Circle K, Passmore was making comments to her, but she ignored him. At this point, Tate positioned herself in between Jaquez and Passmore. Jaquez testified that Tate then asked Passmore to stop making these comments. At this point, Tate and Passmore began to argue. Jaquez turned towards these two telling them to stop arguing. Passmore eventually called Tate a "b***h" and then pushed Tate in the face. (Tr. 262).

**{¶32}** Jaquez testified that she then turned to tell LaRue to call 9-1-1. However, at this moment, Passmore grabbed her with both hands and slammed her head against the counter. Jaquez testified that she never grabbed Passmore but was

scared of him based on his actions. She stated that she did not approach him from behind; that she did not touch him; and that she did not try to touch him. She further clarified that when she turned to tell them to stop arguing that she was at Passmore's side, not behind him.

{¶33} Bair was the designated driver for Tate's birthday party on the night of the incident and testified that she had only consumed half of a beer that night. Bair was inside Circle K at the time of the incident and gave the following account of what transpired:

> He [Passmore] pushed Brittney [Tate] in her face, said something to Latasha [Jaquez]. I did not hear that. And Brittney said, you're not going to talk to my friend that way. And so they were arguing, and then Latasha said something back. And at that point then is when he grabbed Latasha and slammed her head on the floor.

(Tr. 370). She affirmed that she did not "ever see Latasha physically fight with the Defendant[.]" (Tr. 370). Similarly, LaRue affirmed that he did not see Jaquez "do anything threatening to [Passmore.]" (Tr. 241).

{¶34} During his testimony, Passmore stated that Tate moved closer to him as they were arguing and that he believed her to be intoxicated. He then remembers Tate "rushing towards" him. (Tr. 445). He testified that he pushed her in response. At this point, his sister got involved in the struggle with Tate. Passmore testified that he then felt Jaquez on his back. (Tr. 446). In response, he grabbed her and "pushed her as hard as [he] * * * possibly could * * *." (Tr. 447). He stated that he did not intend to hit her head on the counter. He further stated that he "pushed

Latasha [Jaquez] initially, because * * * [he] felt like she was going to harm" him. (Tr. 449). On cross-examination, Passmore testified that he did not recall whether he told the police that Jaquez had put her hands on him.

{¶35} Next, "[t]he second element of a self-defense claim is a combined subjective and objective test." *State v. Hunt*, 8th Dist. Cuyahoga No. 111892, 2023-Ohio-1977, ¶ 26. Thus, "self-defense 'is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" State v. *Thomas*, 77 Ohio St.3d 323, 330, 1997-Ohio-269, 673 N.E.2d 1339, quoting *State v. Sheets*, 115 Ohio St. 308, 310, 152 N.E. 664 (1926). "Part of this entails showing that the defendant used 'only that force that is reasonably necessary to repel the attack.'" *State v. Ray*, 12th Dist. Butler, 2013-Ohio-3671, 997 N.E.2d 205, ¶ 30, quoting *State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139, ¶ 55 (4th Dist.).

{¶36} At trial, Passmore testified that, when he was in the parking lot of Circle K, he told his sister that they needed to lock the truck because a person could rob it in seven seconds. Tate was nearby and said she would only need two seconds. Passmore reported that his interaction with Tate resumed when he was in line in front of the counter. He stated that Tate said, "I got n****z for you." (Tr. 442). Passmore testified that he interpreted this to mean that she was "going to call somebody up here to kill me." (Tr. 442). He also testified that he did not see any weapons in her possession.

{¶37} On cross-examination, he stated he did not report his interaction with Tate in the parking lot to the police. He also admitted that he reported that Tate made him "uncomfortable" and did not report that he was "scared" of her. (Tr. 478). He also affirmed that he told the police that Tate was "talking sh*t to [him]"; that this was disrespectful; and that he "didn't like that * * *." (Tr. 478). While he had previously stated that Tate had made comments that led him to believe she might call someone to beat him, Passmore also admitted that he did not remember whether Tate had a phone readily available to use for this purpose. He also testified that he did not see Tate or Jaquez with any weapons.

{¶38} Passmore testified that he grabbed Jaquez's head with both of his hands and pushed her as hard as he could. Bair and LaRue stated that Jaquez was slammed against the counter. Both of them testified that Jaquez did not physically engage or threaten Passmore in the lead up to her injury. After the incident, Passmore further admitted that he fled the scene and lied about his name to the police. His explanation for this behavior was that he wanted to "[g]et away from those women" and that he wanted to avoid the legal issues this incident would cause for him given he had an outstanding warrant for his arrest in Michigan. (Tr. 473).

{¶39} In summary, Passmore's account of what transpired conflicts at points with the testimony that was provided by the State's witnesses. However, "[a] conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." *State v. Jackson*, 12th Dist. Butler

No. CA2001-10-239, 2002-Ohio-4705, ¶ 48. Jaquez testified that Passmore began interacting with her by making comments that she chose to ignore. She also testified that she did not threaten or make physical contact with Passmore before she was assaulted. Bair and LaRue's testimony was in agreement with Jaquez on this point. Further, Passmore was not able to explain how slamming Jaquez's head into the counter was a proportional response to Tate's purportedly belligerent attitude or was necessary to defend himself in any way.

**{¶40}** Having examined the evidence in the record, we cannot conclude that the evidence weighs more heavily against Passmore's conviction for felonious assault. Further, we also find no indication that the jury lost its way and returned a verdict against the manifest weight of the evidence by concluding that Passmore did not act in self-defense. Accordingly, Passmore's second assignment of error is overruled.

*Third Assignment of Error*

**{¶41}** Passmore argues that the trial court erred in ordering him to pay the costs of prosecution and the fees listed in R.C. 2929.18(A)(4) without first considering his ability to pay these costs.

Legal Standard

**{¶42}** R.C. 2947.23(A)(1)(a) states that, "[i]n all criminal cases, * * * the judge or magistrate shall include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs." R.C. 2947.23(A)(1)(a).

This provision requires the trial court to assess the costs of prosecution against all criminal defendants, regardless of whether the defendant is indigent. *State v. Taylor*, 161 Ohio St.3d 319, 2020-Ohio-3514, 163 N.E.3d 486, ¶ 6. Thus, "[t]he costs of prosecution are mandatory * * *, and trial courts are obligated to impose the costs of prosecution irrespective of a defendant's ability to pay." *State v. West*, 3d Dist. Seneca No. 13-22-07, 2022-Ohio-4069, ¶ 30. Further, "[t]he term 'cost of prosecution,' although not defined, is synonymous with 'court costs' as defined by R.C. 2949.111(A)(1), meaning 'any assessment that the court requires an offender to pay to defray the costs of operating the court.'" *State v. Jackson*, 2013-Ohio-1390, 990 N.E.2d 184, ¶ 19 (3d Dist.), quoting *State v. Hall*, 12th Dist. No. CA2011-05-043, 2011-Ohio-5748, ¶ 16, quoting R.C. 2949.111(A)(1).

Legal Analysis

{¶43} In its judgment entry of sentencing, the trial court ordered Passmore "to pay all costs of prosecution, and any fees permitted pursuant to R.C. 2929.18(A)(4)." (Doc. 82). Passmore argues that the trial court did not consider his ability to pay before ordering him to pay these costs. While a trial court must consider a defendant's ability to pay before imposing a number of financial sanctions, the costs of prosecution are mandatory and must be imposed regardless of a defendant's ability to pay. *Taylor* at ¶ 6. *See* R.C. 2929.19(B)(5). Thus, a "trial court need not consider a defendant's ability to pay * * * prior to imposing court costs." *State v. Lux*, 2d Dist. Miami No. 2010-CA-30, 2012-Ohio-112, ¶ 45.

**{¶44}** Further, this Court has previously held that the fees in R.C. 2929.18(A)(4) "are part of the cost of prosecution * * *." *State v. Nevels*, 3d Dist. Logan No. 8-15-12, 2016-Ohio-3497, ¶ 14, quoting *Jackson*, 2013-Ohio-1390*supra*, at ¶ 19. For this reason, the trial court did not have to consider Passmore's ability to pay before ordering him to pay the fees under R.C. 2929.18(A)(4). *State v. Lantz*, 6th Dist. Fulton No. F-18-011, 2019-Ohio-3307, ¶ 23-25. *See also State v. Rose*, 2022-Ohio-3529, 202 N.E.3d 1, fn. 7 (7th Dist.); *Hall, supra*, at ¶ 16. *But see State v. Rickett*, 4th Dist. Adams No. 07CA846, 2008-Ohio-1637, ¶ 4-5. Thus, with this argument, Passmore has not identified an error that was committed in the process of ordering him to pay these costs. Accordingly, his third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶45}** Passmore argues that the State engaged in prosecutorial misconduct by engaging in a line of questioning that deprived him of his right to a fair trial.

Legal Standard

**{¶46}** To establish prosecutorial misconduct, the "defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 29, quoting *State v. Merriweather*, 2017-Ohio-421, 84 N.E.3d 72, ¶ 45 (12th Dist.).

> Because prosecutorial misconduct implicates due-process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial [or proceeding], not the culpability of the prosecutor.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

*State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 162.

"The identified conduct is examined in the context of the entire proceeding." *State v. Tebelman*, 2023-Ohio-882, 211 N.E.3d 150, ¶ 91 (3d Dist.). "To demonstrate prejudice, 'the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different.'" *Id.* at ¶ 92, quoting *State v. Cureton*, 9th Dist. Medina Nos. 03CA0009-M, 2003-Ohio-6010, ¶ 27.

### Legal Analysis

**{¶47}** In this case, Officer Burkholder was given the opportunity to view and listen to several recordings of the incident that were captured by the security cameras in Circle K. However, the audio recordings captured by the security cameras were not properly transferred when Circle K personnel made a copy of this material for law enforcement. As the audio was not preserved, the State could only play the video footage of the incident for the jury at trial.

**{¶48}** Since Officer Burkholder had listened to the audio recording, the State asked him if he had heard Passmore make any statements in the lead up to the physical altercation. In response, he testified that Passmore told Tate, "I'm going

to kill you." (Tr. 356). The Defense then objected to this statement, arguing that Officer Burkholder did not have a basis to believe that the voice he heard on the recording belonged to Passmore. In response, the State argued that this was Officer Burkholder's personal observation of the recording and that any statements from the party opponent were admissible at trial. The trial court sustained the objection because of a lack of certainty regarding the identity of the declarant.

{¶49} Upon issuing this ruling, the trial court immediately gave a curative instruction, telling the jurors to disregard Officer Burkholder's testimony regarding the statement that he had heard on the recording. Further, in its jury instructions, the trial court again stated that the jurors were not to consider any testimony that was stricken and were to act as though they had never heard these statements. "A jury is presumed to follow a trial court's instructions, including curative instructions." *State v. Akers*, 3d Dist. Logan No. 8-19-31, 2019-Ohio-5171, ¶ 32. *See also State v. Echols*, 2023-Ohio-2206, --- N.E.3d ---, ¶ 38 (1st Dist.). Having reviewed the evidence, nothing in the record suggests that the jurors failed to comply with these instructions.

{¶50} Further, LaRue, Jaquez, and Bair testified that Jaquez did not lay a hand on Passmore before he slammed her against the counter. The testimony also indicated that she was turning away from Passmore and towards LaRue at the time he assaulted her. The jurors were also able to compare these accounts with the video footage of the altercation that was played for them at trial. No testimony suggested

that Jaquez threatened Passmore. After the incident, Passmore then fled the scene and gave the police a false name. Given these facts, we conclude that, even if this question from the prosecutor was improper, Passmore has not demonstrated that the elicited response affected his substantial rights in this case such that, without it, there is a reasonable probability that the outcome would have been different.

{¶51} In conclusion, regardless of whether the identified line of questioning was improper, Passmore has not raised an argument that demonstrates his substantial rights were affected and that he was denied his right to a fair trial. Further, Passmore has not given us a reason to dispense with the presumption that the jurors followed the trial court's repeated instructions to disregard the statement that was stricken from Officer Burkholder's testimony. For these reasons, his fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶52} Passmore argues that he was denied his constitutional right to the effective assistance of counsel.

Legal Standard

{¶53} "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order

to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶54} In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 35, quoting *Strickland* at 687. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 14, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. Further, "[t]actical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *State v. Harrison*, 2015-Ohio-1419, 31 N.E.3d 220, ¶ 75 (3d Dist.).

{¶55} A trial attorney is not required to "raise meritless issues or even all arguably meritorious issues." *State v. Mayse*, 2017-Ohio-1483, 88 N.E.3d 1208, ¶ 24 (3d Dist.). Thus, as a general matter, "[d]efense counsel's decision to stipulate to evidence in a case is a tactical decision." *State v. Townsend*, 9th Dist. Summit No. 23397, 2007-Ohio-4421, ¶ 27. "Moreover, counsel is not deficient by stipulating to facts for which there is ample evidence, or to evidence that is

'unassailable.'" *State v. Mackey*, 12th Dist. Warren No. CA99-06-065, 2000 WL 190033, \*5 (Feb. 14, 2000).

**{¶56}** "In order to establish prejudice, 'the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 122, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). "If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test." *State v. Gear*, 3d Dist. Van Wert No. 15-22-03, 2023-Ohio-1246, ¶ 50.

Legal Analysis

**{¶57}** Before trial, the parties submitted a number of stipulations to the trial court. Passmore makes arguments about two of these stipulations to establish his ineffective assistance of counsel claim. First, defense counsel stipulated to the admission of one of his prior convictions at trial. Before Passmore testified in his defense, the trial court engaged in an extended discussion with the parties about the use of his criminal history pursuant to Evid.R. 609(A)(2). In this discussion, defense counsel indicated that he would question Passmore about his criminal past on direct examination. The initial purpose of this inquiry was to provide an explanation for why Passmore fled the scene of the incident in the pickup truck and gave a fake name to the police upon being stopped.

{¶58} Defense counsel pointed to the fact that a warrant had been issued for Passmore in Michigan because he had failed to report in compliance with the terms of his parole. During his testimony, Passmore indicated that he believed that the police would have learned about the outstanding warrant if he remained at the scene or gave his actual name. He further explained that he did not want to go back to prison because he now had a one-year-old daughter. Defense counsel argued that Passmore acted in self-defense at Circle K but did not remain on the premises afterwards and gave a fake name to law enforcement because of the warrant issued for him in Michigan. This was part of a trial strategy to establish that Passmore's actions after the incident were not reflective of any consciousness of guilt on his part but his fear of returning to prison in spite of his purported innocence in the earlier incident.

{¶59} Another purpose of this inquiry was to explain why Passmore was put on heightened alert by Tate's comments. At trial, the Defense questioned Passmore about his experiences in prison. Passmore testified that he witnessed a number of serious fights while incarcerated and was, for this reason, wary for his safety. He said, "you got to be able to, you know protect yourself. You got to be ready at any moment in time, because anything can happen to you." (Tr. 433). The Defense later asserted that this wariness is why he responded so quickly to defend himself in Circle K. Given this context, we conclude that the decision to make this challenged

stipulation falls squarely within the realm of debatable trial tactics and strategies. This decision does not constitute deficient performance.

**{¶60}** Second, his counsel stipulated to the admission of the video footage from the security camera in Circle K. The evidence in the record indicates that the Circle K employee who was copying the security camera footage from the night of the incident failed to record the sound. For this reason, the recording presented at trial had video footage but no audio.[1] However, on appeal, Passmore has not presented the grounds upon which defense counsel should have objected to this video footage or raised an argument that would suggest that this video footage was even arguably inadmissible.

**{¶61}** At trial, the assistant manager of that Circle K location, LaRue, was called as a witness and identified the video footage for the record. *See State v. Spencer*, 4th Dist. Pickaway No. 19CA6, 2019-Ohio-3800, ¶ 18 (holding that objecting to properly authenticated security camera footage from a bank would have been a futile act and that, for this reason, the failure to object did not constitute ineffective assistance of counsel). Having reviewed the record, we find no indication that the admission of this video footage was improper. We cannot conclude that trial counsel's decision to stipulate to the admission of this video

---

[1] We also note that, as discussed in the fourth assignment of error, Officer Burkholder testified at trial that, when he first viewed the security camera footage from Circle K, the audio was functioning and he could hear someone state, "I'm going to kill you." (Tr. 356). He testified that he believed that Passmore made this statement. After objecting to this testimony, Defense counsel used the fact that the audio recording was not preserved and the resulting uncertainty about who made this remark to successfully argue for this statement to be stricken from the record.

footage constituted deficient performance as Passmore has not demonstrated that objecting to this evidence would have been anything other than a futile act.

**{¶62}** In conclusion, Passmore has not demonstrated that defense counsel's performance at trial was deficient as alleged. Thus, he has failed to carry the burden of establishing an ineffective assistance of counsel claim with these arguments. Accordingly, his fifth assignment of error is overruled.

### *Sixth Assignment of Error*

**{¶63}** Passmore argues that the imposition of consecutive sentences in this case was not supported by the record.

### Legal Standard

**{¶64}** "[T]he proper scope of felony sentence review by Ohio appellate courts is set forth in R.C. 2953.08(G)(2)." *State v. Redmond*, 6th Dist. Lucas No. L-18-1066, 2019-Ohio-309, ¶ 15. Pursuant to this provision, an appellate court may modify or vacate a sentence if it clearly and convincingly finds either

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or *(C)(4) of section 2929.14*, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

(Emphasis added.) R.C. 2953.08(G)(2). R.C. 2929.14(C)(4) states the findings that a trial court must make prior to imposing consecutive sentences and is expressly

included within the purview of R.C. 2953.08(G)(2)(a). R.C. 2929.14(C)(4) reads,

in its relevant part, as follows:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). Thus, the trial court must find (1) that consecutive sentences:

are necessary to protect the public or punish the offender ("the necessity finding");

(2) that consecutive sentences are not disproportionate to the seriousness of the

offense ("the proportionality finding"); and (3) that one of the three factors listed in

R.C. 2929.14(C)(4)(a-c) is applicable. *State v. Rodriquez*, 3d Dist. Hancock Nos.

5-19-40, 5-19-41, 2020-Ohio-2987, ¶ 6.

**{¶65}** If the trial court has made the required findings under R.C. 2929.14(C)(4), "the appellate court may then determine whether the record clearly and convincingly supports those findings." *State v. Gwynne*, --- Ohio St.3d ---, 2022-Ohio-4607, --- N.E.2d ---, ¶ 26. "R.C. 2953.08(G)(2) does not require deference to the trial court's findings under R.C. 2929.14(C)(4)." *Id*. at ¶ 31. Rather, [a]ppellate review "of the record and findings is de novo with the ultimate inquiry being whether it clearly and convincingly finds * * * that the evidence in the record does not support the consecutive-sentence findings * * *." *Id*. at ¶ 27.

> Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*State v. Taflinger*, 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954). In examining the findings on appeal,

> the first core requirement is that there be some evidentiary support in the record for the consecutive-sentence findings that the trial court made. A record that is devoid of evidence simply cannot support the findings required by R.C. 2929.14(C)(4); there must be an evidentiary basis upon which these findings rest.

*Gwynne* at ¶ 29. The second core requirement is that the evidentiary basis be

> adequate to fully support the trial court's consecutive-sentence findings. This requires the appellate court to focus on both the quantity and quality of the evidence in the record that either supports or contradicts the consecutive-sentence findings.

*Id.* at ¶ 29. Thus, "[t]he record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences." *Wilson*, *supra*, at ¶ 148, quoting *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28.

Legal Analysis

**{¶66}** On appeal, Passmore argues that the findings made by the trial court were not supported by the record. In this case, the trial court ordered the prison term imposed to be served consecutively to the prison term he was "currently serv[ing] in Michigan * * *." (Sentencing Tr. 30). At sentencing, the trial court expressly found that imposing this sentence consecutively was "necessary * * * to protect the public from future crime" and was "not * * * disproportionate to the seriousness of the conduct and the danger posed by the Defendant." (Sentencing Tr. 30). The trial court concluded that the factor listed in R.C. 2929.14(C)(4)(c) was applicable in this case, finding that consecutive sentences were necessary to protect the public based upon Passmore's "significant criminal record." (Sentencing Tr. 28).

**{¶67}** Initially, Passmore argues that this case does not present multiple offenses as required under R.C. 2929.14(C)(4) in order to impose consecutive sentences. At sentencing, defense counsel acknowledged that the trial court could impose consecutive sentences in this case. Further, "the 'multiple prison term' language * * * from R.C. 2929.14(C)(4) has been interpreted to include previously

imposed prison terms from other jurisdictions." *State v. Knox*, 8th Dist. Cuyahoga No. 107414, 2019-Ohio-3567, fn. 2. For this reason, his first argument herein is without merit. We turn now to examining whether the evidence in the record supports the trial court's R.C. 2929.14(C)(4) findings.

**{¶68}** As to the necessity finding, the trial court stated that, while Tate "may have been, to some degree, the provocateur," the altercation "was a matter of words, which never justifies a response * * *." (Sentencing Tr. 22, 23). On the one hand, the trial court noted that Tate's actions indicated that Passmore did not act "indiscriminately * * * without any explanation * * *." (*Id*. at 22). On the other hand, the trial court also noted that Passmore "directed * * * [his] anger and * * * [his] violence at the wrong person" as Jaquez "was not involved in precipitating this event at all." (Sentencing Tr. 22). The trial court also noted that Passmore was "in Ohio, without permission" during his parole. (*Id*. at 26). Based on these facts, the trial court concluded that consecutive sentences were necessary to protect the public from future harm.

**{¶69}** As to the proportionality finding, the trial court discussed the fact that "Jaquez was seriously injured" and now "has some ongoing issues and some psychological issues in terms of her concern." (Sentencing Tr. 23). At trial, Passmore admitted that Jaquez suffered serious physical harm during the incident. The testimony indicated that Passmore's actions immediately rendered Jaquez unable to stand or see clearly. Jaquez also testified about her injuries and indicated

that she was still experiencing numbness around the area of her head wound by the time of the trial. Based on these facts, the trial court concluded that consecutive sentences were not disproportionate to the seriousness of the offense.

{¶70} As to the R.C. 2929.14(C)(4)(c) finding, the State described Passmore's history of criminal conduct at sentencing. His criminal record indicated that he had convictions for participating in three armed robberies. He had served over thirteen years in prison before being released on parole in 2017 in Michigan. Within three months of his release, he committed the offenses of disorderly conduct and resisting arrest. By 2020, he had absconded on his parole, causing a warrant to be issued for his arrest. This warrant remained outstanding until Passmore was apprehended after the incident in this case. Based on these facts, the trial court found that Passmore's history of criminal conduct indicated that consecutive sentences were necessary to protect the public from future crime.

{¶71} Having examined the evidence, we cannot conclude that the trial court's findings are clearly and convincingly unsupported by the record. We also note that the trial court not only made the required findings but also incorporated them into its judgment entry of sentencing. Thus, this case does not present the grounds set forth in R.C. 2953.08(G)(2) to modify or vacate the imposition of consecutive sentences. Accordingly, his sixth assignment of error is overruled.

*Conclusion*

**{¶72}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Hancock County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**