[Cite as *State v. Forrest*, 2024-Ohio-5861.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**STATE OF OHIO,**                                          **CASE NO. 1-23-31**

    **PLAINTIFF-APPELLEE,**

    **v.**

**DEONTRAY Q. FORREST,**                      **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR2020 0123**

**Judgment Affirmed**

**Date of Decision: December 16, 2024**

**APPEARANCES:**

    *William T. Cramer* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Deontray Q. Forrest ("Forrest"), appeals the May 12, 2023 judgment of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On May 14, 2020, the Allen County Grand Jury indicted Forrest on four counts: Count One of felonious assault in violation of R.C. 2903.11(A)(2), (D)(1)(A), a second-degree felony; Count Two of murder in violation of R.C. 2903.02(A), (D) and R.C. 2929.02(B), an unclassified felony; Count Three of murder in violation of R.C. 2903.02(B), (D) and R.C. 2929.02(B), an unclassified felony; and Count Four of having weapons while under disability in violation of R.C. 2923.13(A)(3), (B), a third-degree felony. Counts One, Two, and Three each included a firearm specification pursuant to R.C. 2941.145(A) and a criminal-gang-activity specification pursuant to R.C. 2941.142(A).

{¶3} At his arraignment on May 22, 2020, Forrest entered not guilty pleas to the counts and specifications in the indictment. Prior to trial, in accordance with Crim.R. 12.2, Forrest filed a notice of intent to offer evidence and argue in support of self-defense and defense of another.

{¶4} The matter came for a jury trial on May 8-11, 2023.[1] At the conclusion of the trial, the jury found Forrest guilty of each of the counts and the

---

[1] Prior to the commencement of trial, the State moved to dismiss the criminal-gang-activity specification associated with Counts One, Two, and Three, which the trial court granted. (Doc. No. 314).

accompanying firearm specifications. Furthermore, with respect to Counts One, Two, and Three, the jury made specific findings that Forrest did not act in self-defense. The trial court accepted the jury's verdicts and proceeded directly to sentencing.

{¶5} The trial court found that Counts One, Two, and Three merged, and the State elected for the trial court to sentence Forrest on Count Two. The trial court then sentenced Forrest as follows: a mandatory term of 15 years to life in prison on Count Two, mandatory terms of three years in prison for each of the firearm specifications associated with Count Two and Count Three, and 36 months in prison for Count Four. The trial court ordered the prison terms to be served consecutively for an aggregate sentence of 21 years and 36 months to life in prison. The following day, the trial court filed its judgment entry of sentence.

{¶6} Forrest raises a single assignment of error for our review.

**Assignment of Error**

**The weight of the evidence did not support the verdict finding that the State disproved self-defense or defense of another beyond a reasonable doubt.**

{¶7} In his assignment of error, Forrest contends that the weight of the evidence did not support the jury's finding that Forrest did not act in self-defense or defense of another. For the reasons that follow, we disagree.

*Standard for Manifest-Weight Review*

{¶8}   In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determin[e] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).  A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).  When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Forrest's Convictions and Evidence Presented at Trial*

{¶9}   The jury found Forrest guilty of felonious assault, two murder charges, and having weapons while under disability.  At trial, Forrest expressly admitted to possessing a weapon while under disability (Count Four) and; further, self-defense did not apply to that conviction.  However, as an initial matter, to the extent Forrest challenges the weight of the evidence supporting the jury's findings

of guilt as to the felonious assault (Count One) and murder (Count Three), we need not address those arguments. *See State v. Sheldon*, 2019-Ohio-4123, ¶ 11 (3d Dist.), citing *State v. Turner*, 2019-Ohio-144, ¶ 22 (2d Dist.). R.C. 2941.25 provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." "Indeed, the Supreme Court of Ohio has explicitly stated that a 'conviction' requires both a finding of guilt and a sentence." *State v. Miller*, 2019-Ohio-4121, ¶ 12 (3d Dist.). "Specifically, '[w]hen counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless' beyond a reasonable doubt." *Sheldon* at ¶ 11, quoting *State v. Ramos*, 2016-Ohio-7685, ¶ 14 (8th Dist.). Here, error, if any, with respect to the sufficiency or weight of the evidence as to Forrest's charges under Counts One and Three is harmless beyond a reasonable doubt because those counts were merged with Count Two. *See State v. Powell*, 49 Ohio St.3d 255, 263 (1990), *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn.4. Accordingly, our analysis will focus solely on Count Two.

**{¶10}** Forrest was convicted of murder in violation of R.C. 2903.02(A) which provides that "[n]o person shall purposely cause the death of another[.]" Forrest attempted to assert a self-defense claim to the allegation.

R.C. 2901.05(B)(1), states as follows:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶11}** "Under R.C. 2901.05(A) and (B)(1), a defendant claiming self-defense has the burden of production—that is, the burden of producing evidence that 'tends to support' his use of force in defending himself." *State v. Estelle*, 2021-Ohio-2636, ¶ 18 (3d Dist.). "Under the current version of R.C. 2901.05, if evidence is presented 'that tends to support' that the defendant used the force in self-defense, the *prosecution* must prove beyond a reasonable doubt that the accused did not act in self-defense." (Emphasis sic.) *State v. Flory*, 2020-Ohio-5136, ¶ 43 (3d Dist.). Accordingly, "the burden of *proof* for . . . self-defense has shifted to the state," but "the burden of *production* for . . . self defense[] remains with the defendant." (Emphasis sic.) *State v. Messenger*, 2021-Ohio-2044, ¶ 44 (10th Dist.).

**{¶12}** "The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself." *State v. Eddy*, 2022-

Ohio-3965, ¶ 14 (3d Dist.). "The use of a gun constitutes the use of deadly force." *State v. Dale*, 2013-Ohio-2229, ¶ 15 (2d Dist.).

**{¶13}** The elements of a self-defense claim involving deadly force are:

(1) That the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant has a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

**{¶14}** "[T]he State must 'disprove at least one of the elements of self-defense beyond a reasonable doubt.'" *State v. Passmore*, 2023-Ohio-3209, ¶ 29 (3d Dist.), quoting *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.). "The elements of self-defense are cumulative, and a defendant's claim of self-defense fails if any one of the elements is not present." *State v. Ridley*, 2022-Ohio-2561, ¶ 15 (1st Dist.).

**{¶15}** At trial, the court gave the jury the following instructions relating to self-defense:

SELF DEFENSE

The defendant claims he acted in self-defense or defense of another person. The defendant is allowed to use deadly force in self-defense or defense of another person. The state must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense or defense of another person.

>    To prove that the defendant, when using deadly force, did not act in self-defense or in defense of another person, the state must prove beyond a reasonable doubt at least one of the following:
>
>    (A) the defendant was at fault in creating the situation giving rise to his shooting Timothy White as alleged in Count Two (2); or
>
>    (B) the defendant did not have reasonable grounds to believe that he or another person was in imminent or immediate danger of death or great bodily harm; or
>
>    (C) the defendant did not have an honest belief, even if mistaken, that he or another was in imminent or immediate danger of death or great bodily harm; or
>
>    (D) the defendant violated a duty to retreat to avoid the danger; or
>
>    (E) the defendant used unreasonable force.
>
>    There is no requirement that the jury be unanimous as to which of the above you believe the State disproved.

(Doc. No. 308).

**{¶16}** Here, Forrest concedes that the trial court correctly instructed the jury on self-defense, but argues that the jury lost its way by finding that Forrest did not act in self-defense. We disagree.

**{¶17}** At trial, the State presented testimony that in the early morning hours of February 4, 2020, law enforcement was dispatched to Levels Lounge, in Lima, Ohio after receiving reports of shots being fired. When law enforcement arrived at the scene, they observed two individuals dead on the floor in the bar, Terell McGraw ("McGraw") and Devontae Upshaw ("Upshaw"). Shortly thereafter, in a walkway located near the bar, law enforcement discovered the body of Timothy White

("White"), the victim in the instant case. All three victims had apparent gunshot wounds.

{¶18} Michael Liles ("Liles") who co-owned Levels Lounge and was bartending in the early morning hours of February 4, 2020, testified White was present at the bar with his brother, McGraw. (May 8-11, 2023 Tr. at 196-199). Liles recalled that Forrest was also at the bar with friends, including his fiancée, Mercedes Kelly ("Kelly"). (*Id.* at 198-199). According to Liles, at some during the evening and early morning, he learned that there was "something going on" between White and Forrest. (*Id.* at 216-217). As a result, Liles asked White and McGraw to leave the bar. (*Id.* at 217). Liles stated that he intended to also ask Forrest to leave the bar, but planned to wait until White and McGraw left, so the trio was not in the parking lot together. (*Id.* at 217-218). While Liles was talking to White, Upshaw arrived at the bar. (*Id.* at 218-219). Then, Liles heard a scuffle. (*Id.* at 219). According to Liles, White pushed Liles out of the way and opened fire. (*Id.*).

{¶19} Law enforcement officers were able to obtain video surveillance footage of the inside and outside of Levels Lounge on February 4, 2020, as well as surveillance footage from a building located nearby. Portions of the surveillance footage, introduced as State's Exhibit 69, were played for the jury. (State's Ex. No. 69). The footage depicts White, Upshaw, and Forrest inside of Levels Lounge for a period of time before the shooting. (*Id.*); (May 8-11, 2023 Tr. at 535-541). For much of the footage, Upshaw and White are standing at the north side of the bar,

and Forrest is depicted in the middle and south side of the bar. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 538-541). At one point, Forrest and White speak, and following the interaction, Forrest returns to the middle of the bar area where he interacts with other bar patrons, including his fiancée, Kelly. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 541).

{¶20} Shortly thereafter, Liles approaches White and the men speak in an animated manner. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 542). As that interaction is taking place, Upshaw enters the bar. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 544-545). Shortly thereafter, Upshaw and McGraw appear to exchange heated words, and Upshaw punches McGraw in the face. (State's Ex. No. 69). Nearly simultaneously, White, who is standing against the wall near the north side of the bar, pulls out a gun and begins to shot. (*Id.*). McGraw and Upshaw fall to the floor of the bar. (*Id.*); (May 8-11, 2023 Tr. at 545-546). White continues to fire into Upshaw's back as Upshaw unsuccessfully attempts to crawl away. (*Id.*); (*id.*). Then, White removes his stocking cap, puts his gun in his pocket, and puts the hood of his sweatshirt up over his head, and walks out the north door of Levels Lounge. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 546).

{¶21} As White is opening fire inside the bar, Forrest is depicted pointing a firearm at White. (State's Ex. No. 69). Initially, the firearm does not appear to discharge. (*Id.*). However, as White exits the bar, Forrest's firearm discharges and

Forrest's bullet shatters the window at the north side of the bar near the door White was exiting. (*Id.*); (May 8-11, 2023 Tr. at 546, 564).

{¶22} After White exits the bar, Forrest runs to the south end of the bar, which houses a billiards room, and unsuccessfully attempts to open a side door leading to the parking lot located to the west of Levels Lounge. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 564-565). When Forrest is unable to exit the bar through that door, Forrest is depicted running out the door on the north side of bar, the same door that White used shortly before. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 545, 548).

{¶23} The exterior surveillance cameras depict Forrest, with his gun in his hand, peer around the corner and observe White walking away from the bar and toward a walkway located between two nearby buildings. (State's Ex. No. 69); (May 561-562, 575-576). Forrest then follows in the direction of White, who is out of the view of the surveillance cameras, and takes a stance and fires in White's direction. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 575-576). Moments later, gunshots fire from the walkway where White is located. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 576-577).

{¶24} Forrest then runs back through the parking lot and reenters Levels Lounge through the same north door that he exited moments before. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 548, 562). He is depicted running south to the rear of the bar and into the bathroom. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 565).

-11-

A brief time later, he exits the bathroom and reenters the main area of the bar. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 565-566).

**{¶25}** Shortly after the shooting, multiple law enforcement officers arrived at the scene. Several law enforcement officers interacted with Forrest at the scene, but Forrest denied any knowledge of the identity of the shooter inside the bar. (State's Ex. Nos. 72, 73, 74); (May 8-11, 2023 Tr. at 254, 285, 302-303). Soon after arriving on the scene, officers discovered White dead in the walkway with apparent gunshot wounds. Deputy Aaron Smith ("Deputy Smith"), who first located White, observed him laying facedown approximately 25 to 30 feet inside the walkway. (State's Ex. No. 39); (May 3-11, 2023 Tr. at 315). Deputy Smith observed a Glock 26 subcompact 9-millimeter pistol ("Glock") in White's right hand, tucked slightly underneath his body. (State's Ex. No. 47); (May 8-11, 2023 Tr. at 316, 322-323). The firearm did not have any cartridges inside it. (May 8-11, 2023 Tr. at 323). A shell casing was located near White's body. (*Id.* at 324-325). Outside the bar, near the west parking lot, officers found five spent .380 casings near a vehicle that had a bullet hole in the fuel door. (*Id.* at 344, 390).

**{¶26}** Officers at the scene located bullet holes in the floor of the bar and seven 9-millimeter bullet casings located near Upshaw and McGraw's bodies. (*Id.* at 332). In the men's bathroom, officers located a Kimber Micro Carry .380 pistol

("Kimber .380") under the trash can liner.[2] (State's Ex. No. 58); (May 8-11, 2023 Tr. at 359-361, 380, 530-531).

{¶27} A DNA analyst testified that the swab of the trigger of the Kimber .380 contained a mixture of DNA with the major contributor being Marquavous Liles ("Marquavous") on the trigger. (State's Ex. No. 87); (May 8-11, 2023 Tr. at 409-410). The Glock contained DNA consistent with White and McGraw on the grip and DNA consistent with White on the slide. (State's Ex. No. 87); (May 8-11, 2023 Tr. at 411-413). A firearm-identification expert testified that the firearms recovered from the scene were operable. (State's Ex. No. 88); (May 8-11, 2023 Tr. at 466). Additionally, the expert testified the .380 casings recovered from the scene were fired from the Kimber .380 and the 9-millimeter casings were fired from the Glock. (State's Ex. No. 88); (May 8-11, 2023 Tr. at 467-470). The bullets recovered from White's autopsy were determined to have been fired by the Kimber .380 and the bullets recovered from Upshaw and McGraw were consistent with the Glock. (State's Ex. No. 88); (May 8-11, 2023 Tr. at 467-470).

{¶28} Dr. Jeffrey Hudson ("Dr. Hudson"), the deputy coroner and forensic pathologist, performed autopsies on White, McGraw, and Upshaw. (May 8-11, 2023 Tr. at 420-421). According to Dr. Hudson, White died from multiple gunshot wounds. (State's Ex. No. 77); (May 8-11, 2023 Tr. at 445). Specifically, Dr.

---

[2] Officers also located a Sig Sauer P938 Equinox micro compact 9-millimeter handgun in a trashcan in the billiards room. (State's Ex. Nos. 20, 57); (May 8-11, 2023 Tr. at 337, 357, 379-380). However, there is no indication that firearm was involved in the incident. (May 8-11, 2023 Tr. at 380).

-13-

Hudson described four gunshot wounds – a gunshot wound to White's chest and three gunshot wounds to his legs, and three bullets were recovered from White's body during the autopsy. (State's Ex. No. 77); (May 8-11, 2023 Tr. at 427-441).

{¶29} According to Dr. Hudson, Upshaw's cause of death was multiple gunshot wounds. (State's Ex. No. 75); (May 8-11, 2023 Tr. at 449). Dr. Hudson observed five gunshot wounds to Upshaw's body and recovered one bullet during the autopsy and another bullet from the body bag Upshaw was transported in. (State's Ex. No. 75); (May 8-11, 2023 Tr. at 448). Dr. Hudson testified that McGraw's cause of death was a single gunshot wound to the head and that the bullet was recovered during the autopsy. (State's Ex. No. 76); (May 8-11, 2023 Tr. at 450, 452).

{¶30} Shortly after the incident on February 4, 2020, a warrant was issued for Forrest's arrest in connection to the death of White. (May 8-11, 2023 Tr. a 501-502, 585). Approximately two months after the shooting, Forrest was apprehended in Cleveland, and soon thereafter Detective Steven Stechschulte ("Det. Stechschulte") and Detective Sean Neidemire ("Det. Neidemire") had the opportunity to interview Forrest. (*Id.* at 502-503, 585-587). In Det. Stechschulte's interview, portions of which were played to the jury, Forrest denied that he was involved in the February 4, 2020 incident. (State's Ex. No. 89); (May 8-11, 2023 Tr. at 503, 518). Det. Stechschulte testified that, from prior investigations, he was aware Upshaw and Forrest were friends. (May 8-11, 2023 Tr. at 499-500). Det.

Stechschulte was also aware of prior issues between Forrest and White and between Upshaw and White. (*Id.* at 500-501). Det. Stechschulte also opined that Upshaw was White's intended target and that the shot which struck and killed McGraw was actually intended for Upshaw. (*Id.* at 507-508).

{¶31} Forrest testified in his own defense. According to Forrest, he was present at Levels Lounge on February 4, 2020 with friends, including his fiancée, Kelly, to celebrate the birthday of Allesha Julien ("Julien"), who was Upshaw's significant other and the mother of Upshaw's child. (*Id.* at 619-621). He stated that he received a ride to Levels Lounge from his friend, Adriana Denson, and that Kelly and Julien were at the bar when Forrest arrived. (*Id.* at 632-633).

{¶32} According to Forrest, he had known Upshaw since they were children and they recently became close through their partners, Julien and Kelly, who were friends. (*Id.* at 621). Forrest further stated that, prior to the night of February 4, 2020, he did not know White well, but knew that he had a reputation for violence and was known to be dangerous. (*Id.* at 623-624).

{¶33} Forrest stated that when he arrived at Levels Lounge on February 4, 2020, he spoke to his friend, Marquavous, who is the son of Liles. (May 8-11, 2023 Tr. at 630, 634). After the pair talked for approximately 10 to 20 minutes, Marquavous indicated that he had to leave the bar and asked Forrest to hold his firearm, a Kimber .380, to which Forrest agreed. (*Id.* at 634). Forrest testified that, prior to that interaction, he had never seen or handled the firearm before and did not

know how to operate it. (*Id.* at 629). According to Forrest, he knew that Marquavous was driving a white rental SUV. (*Id.* at 630). Although Forrest did not have confirmed plans for how he was going to get home that night, he intended to ride home with Marquavous upon his return to the bar. (*Id.* at 633).

{¶34} Forrest contended that he did not observe White enter the bar, and for some time, he was unaware that White was present. (*Id.* at 636). At some point, after noticing his arrival, Forrest approached White to make sure "everything [was] cool." (*Id.* at 639); (State's Ex. No. 69). Forrest testified he wanted to make sure everything was okay and he concluded from the interaction that everything was all right and there weren't any problems. (*Id.* at 642); (State's Ex. No. 69).

{¶35} According to Forrest, he observed an interaction between Liles and White which confused Forrest because he had just received assurances from White that there were no problems. (*Id.* at 644-645). Forrest indicated he could be observed on State's Exhibit 69 looking at his phone because he was receiving a call and a text message. (*Id.* at 646-648); (State's Ex. No. 69); (Defendant's Ex. No. R). The text was from Upshaw, informing Forrest that he was on his way to Levels Lounge, and the phone call was from Marquavous, informing Forrest that he was about to pull up to the bar. (May 8-11, 2023 Tr. at 646, 648).

{¶36} Approximately four minutes later, Upshaw entered the bar. (State's Ex. No. 69). However, Forrest, who could be seen in the surveillance footage talking to Kelly and Julien, did not appear to observe Upshaw enter. (State's Ex.

No. 69); (May 8-11, 2023 Tr. at 649).  Forrest stated that he eventually noticed Upshaw, White, and Liles talking toward the north end of the bar, but at the time, he was not concerned that "something bad" may happen and felt that "nothing [is] going on."  (*Id.* at 652, 654); (State's Ex. No. 69).

{¶37} However, Forrest observed Upshaw punching McGraw in the face while White stood against the wall near the north end of the bar.  (State's Ex. No. 69); (May 8-11, 2023 Tr. at 654-655).  Then, Forrest saw White pulled out a gun and began to shoot.  (State's Ex. No. 69); (May 8-11, 2023 Tr. at 655).  As White was shooting, Forrest drew the Kimber .380 that he was holding for Marquavous and pointed the firearm toward White.  (State's Ex. No. 69); (May 8-11, 2023 Tr. at 656-657).  Forrest testified that, in that moment, he feared for the safety of everyone in the bar, especially for Upshaw, himself, Kelly, and Julien.  (May 8-11, 2023 Tr. at 657-658).  Forrest stated he believed it was necessary to shoot White in order to save the lives of the others present in the bar.  (*Id.* at 658).  According to Forrest, when he aimed the gun and pulled the trigger a laser sight came on, but nothing happened.  (*Id.* at 659); (State's Ex. No. 69).  Forrest stated that he assumed that "something was wrong with the gun."  (May 8-11, 2023 Tr. at 659).

{¶38} Unsure whether White noticed Forrest aiming the gun at him, Forrest turned around and ran in the opposite direction.  (*Id.* at 664); (State's Ex. No. 69).  Forrest stated that he feared White would see Forrest with the gun and shoot him.  (May 8-11, 2023 Tr. at 662, 665).  However, in the chaos, Forrest tripped and fell

to the floor. (*Id.* at 665-666); (State's Ex. No. 69). From the floor, Forrest continued to try to get the gun to work, and in the process, he ejected shells. (May 8-11, 2023 Tr. at 668); (State's Ex. No. 69). Nonetheless, the gun still did not fire. (May 8-11, 2023 Tr. at 668); (State's Ex. No. 69). Forrest observed White walk to the door as Forrest continued attempting to fire the gun at White. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 673). Eventually, the gun did fire, and Forrest shot out the window at the north end of the bar as White exited the establishment. (State's Ex. No. 69); (Defendant's Ex. No. H); (May 8-11, 2023 Tr. at 674).

{¶39} Forrest then got up from the floor and attempted to exit the building from the side door leading to the west parking lot. (State's Ex. No. 69); (May 8-11, 2023 Tr. at 675). Forrest explained that his purpose in attempting to exit through the side door was that he recalled that Marquavous had told Forrest on the phone that he was about to pull up to the bar, and Forrest worried that Marquavous could be in danger. (May 8-11, 2023 Tr. at 675). After failing to exit out the side door, Forrest traveled quickly to the north exit of the bar that White had just left. (May 8-11, 2023 Tr. at 675-676); (State's Ex. No. 69). Again, Forrest stated his purpose in doing so was to check on Marquavous and make sure he was safe. (May 8-11, 2023 Tr. at 676). Forrest reached the vestibule where he could be seen looking to the direction of the west parking lot while carrying the gun in his hand. (*Id.* at 677-678); (State's Ex. No. 69). Forrest stated he was looking in the direction of the parking lot where he knew Marquavous to be parked. (May 8-11, 2023 Tr. at 677-

679); (State's Ex. No. 69). Forrest testified that he observed Marquavous's white rental vehicle in the west parking lot and feared that White was about to shoot and kill Marquavous. (May 8-11, 2023 Tr. at 711-713). Forrest described White as walking "with a purpose" and "fast paced" toward the white vehicle. (*Id.* at 713); (State's Ex. No. 69).

{¶40} Forrest testified that although he had a clear shot of White, he did not take the shot because White did not yet raise his gun. (May 8-11, 2023 Tr. at 714, 717). Forrest stated that as he watched Marquavous pull up, he saw movement coming from the walkway between the nearby buildings. (*Id.* at 721). Forrest testified that a white vehicle, which Forrest identified as being driven by Marquavous, was pulling up to get Forrest and that Forrest intended to get into the vehicle and tell Marquavous what had happened inside the bar. (*Id.* at 721-723); (State's Ex. No. 69). However, Forrest testified that he did not make it to the car because in his peripheral vision he saw White raise his gun. (May 8-11, 2023 Tr. at 722-723). Forrest testified that, in response, he "just started shooting." (*Id.* at 722-723). Forrest testified he did not even aim the firearm but "just was firing" because he "knew he had to . . . get [his] shot off before [White] did" and fired the gun until he had no more bullets. (*Id.* at 726). He stated, "I just started shooting because I knew if I didn't start shooting he was going to shoot me." (*Id.* at 727).

{¶41} Forrest testified that when he ran back into the bar after shooting White, he believed that he was still getting shot at and he was trying to get away

"because bullets [were] still coming my way." (*Id.* at 735). Forrest stated that when he reentered the bar, he did not believe any of his bullets had hit White because he had observed several of the bullets hit the ground. (*Id.*).

{**¶42**} Upon reentering the bar, Forrest admitted he ran into the men's bathroom and attempted to conceal the gun in the trashcan. (*Id.* at 735-736); (State's Ex. No. 69). Forrest explained that he was aware the police were about to arrive and he did not want the firearm on his person because he distrusts the police and believed they were biased against him. (May 8-11, 2023 Tr. at 736).

{**¶43**} Forrest admitted that after officers arrived, he interacted with them, but did not tell the officers he had shot out the window on the north end of the bar, did not tell the police about the Kimber .380 he concealed in the trashcan in the bathroom, or that he had left the bar and fired shots in the direction of White. (May 8-11, 2023 Tr. at 736-737). Forrest explained there was "a lot going on" and he was trying to console Julien and Kelly who were very upset and were attempting to perform CPR on Upshaw. (*Id.* at 737-738).

{**¶44**} Shortly thereafter, Forrest and Mercedes left Levels Lounge out the side door on foot and walked toward St. Rita's Hospital to see if Upshaw had been transported there. (*Id.* at 738-739). Then, Forrest received a ride to a friend's house. (*Id.* at 739).

{**¶45**} Forrest explained that he did not find out that White had been shot or killed until the following morning. (May 8-11, 2023 Tr. at 739). He also learned

there was a warrant for his arrest, but did not turn himself in. (*Id.* at 739-740). Forrest reasoned that he needed to obtain a lawyer and wanted to get his affairs in order. (*Id.* at 739).

{¶46} Forrest also conceded that he told detectives, "I didn't kill nobody." (*Id.* at 742). Forrest reasoned that he made that statement because he believed that by admitting he killed White, it was insinuating that he "just flat out murdered somebody" when, in his view, he protected himself and was acting in self-defense. (*Id.*).

*Analysis*

{¶47} At trial, Forrest argued that he acted in self-defense and defense of others when he shot and killed White. Forrest claimed that the encounter outside the bar, which resulted in Forrest killing White, was a continuation of the encounter in the bar, where White shot McGraw and Upshaw. Forrest contends he followed White out of the bar because he was concerned about the safety of his friend, Marquavous, who Forrest believed was arriving at the bar, unarmed. Forrest alleges he only opened fire after White raised his gun.

{¶48} However, based on our review of the evidence presented, we find that the jury was also free to conclude Forrest's actions were not done in self-defense.

{¶49} First, Forrest's self-defense claim is predicated on his commentary of the surveillance videos of the incident from both inside and outside of the bar. Notably, Forrest's arguments relating to the motivation for his actions,

specifically trying to protect Marquavous, are almost entirely based on his own statements. Indeed, if the jury did not find Forrest's testimony credible, they could have found that Forrest pursued White into the parking lot to shoot him in order to avenge the death of his friend, Upshaw. Moreover, although Forrest claimed he shot White only after White drew his firearm, this action was not depicted in the surveillance footage. (State's Ex. No. 69).

{¶50} "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 2022-Ohio-571, ¶ 20 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d, at paragraph one of the syllabus. "'The trier of fact is best able "to view the witnesses and observe their demeanor, gestures[,] and voice inflections, and use these observations in weighing the credibility of the proffered testimony."'" *State v. Brentley*, 2023-Ohio-2530, ¶ 33 (3d Dist.), quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

{¶51} The jury had the opportunity to observe Forrest at trial. Based on our review of the record, it is clear that the jury did not find Forrest to be credible. "[I]t is within the province of the jury to parse out the credible portions of the witnesses'

testimonies." *State v. Waller*, 2023-Ohio-493, ¶ 20 (3d Dist.). Indeed, the State's evidence, most notably the video surveillance evidence, sufficiently supports the jury's credibility assessments, and we find no basis to alter its analysis.

**{¶52}** "A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." *State v. Elam*, 2022-Ohio-1895, ¶ 14 (12th Dist.). "Ohio courts have long recognized that a defendant is at fault in creating the situation giving rise to the affray when the defendant chooses to confront the victim or knowingly go to a place where the victim will be, even when the defendant's action was otherwise completely lawful." *Id.* at ¶ 15.

**{¶53}** The jury could have reasonably concluded from the State's evidence that Forrest did not have a reasonable belief that he, or anyone else, was in imminent harm when he shot White. The video surveillance evidence clearly depicts White taking off his hat, pulling up the hood on his sweatshirt, putting the gun in his coat pocket, and walking out of the bar. (State's Ex. No. 69). Further, the video surveillance portrays White walking through the parking lot and away from the bar. (*Id.*). In contrast, Forrest is depicted leaving Levels Lounge with the firearm in his hand and peering around the corner in the direction White was headed. (*Id.*). From this evidence, the jury could have concluded White had withdrawn from the situation and was no longer a threat when Forrest followed him into the parking lot. *See State v. Greenstreet*, 2023-Ohio-4224, ¶ 29 (9th Dist.).

**{¶54}** Furthermore, although Forrest testified he only drew his weapon after he observed White raise his gun in a shooting position, the record is clear that Forrest fired at White at least twice before White returned fire. Forrest also alleged that because White supposedly raised his firearm, he felt that he had no opportunity to assume a shooting position and simply began to fire wildly, unsure if his bullets had struck White. However, the surveillance video depicts Forrest assume a shooting position and confidently fire in White's direction. Moreover, contrary to Forrest's claim of just shooting wildly in White's direction, Dr. Hudson testified White had been struck by four bullets with one hitting White in the chest. Additionally, Forrest's credibility to the jury may have been undermined by Forrest's actions following the encounter, including concealing the firearm in the restroom and denying knowledge of the events to law enforcement on the scene, evasion of arrest, and denial of his involvement following his eventual arrest. Moreover, although Forrest's claim of self-defense is based largely on a claim of defense of Marquavous, little evidence, other than Forrest's own testimony, corroborates Forrest's claims that Marquavous was even present at Levels Lounge on February 4, 2020.

**{¶55}** Having examined the evidence in the record, we do not conclude that the jury lost its way when it returned a verdict concluding that Forrest's actions were not in self-defense. *See State v. Passmore*, 2023-Ohio-3209, ¶ 39-40 (3d Dist.). Accordingly, Forrest's assignment of error is overruled.

*Conclusion*

**{¶56}** For the foregoing reasons, Forrest's assignment of error is overruled.

Having found no error prejudicial to the appellant herein in the particulars assigned

and argued, we affirm the judgment of the Allen County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN and BALDWIN, J.J., concur.**

**\*\*Judge Craig R. Baldwin of the Fifth District Court of Appeals, sitting by
Assignment of the Chief Justice of the Supreme Court of Ohio.**

**/jlm**